The PEOPLE of the State of
Colorado, Petitioner,

v.

Mark Gus CARLSON, Respondent.

No. 82SC20.

Supreme Court of Colorado,
En Banc.

Jan. 30, 1984.

Rehearing Denied Feb. 21, 1984.

evidence resulting from the seizure, including the officer's observations of the defendant during roadside sobriety testing. We conclude that a police officer in the course of a valid traffic stop may order the driver to get out of the car and walk to the rear of the vehicle without violating the federal or state proscription against unconstitutional searches and seizures. We accordingly reverse the order of the district court and remand the case for further proceedings on the issue of whether the defendant voluntarily consented to roadside sobriety testing.

Alexander M. Hunter, Dist. Atty., Randall John Paulsen, Richard F. Good, Alan C. Katz, Deputy Dist. Attys., Boulder, for petitioner.

Robert J. Dieter, Legal Aid and Defender Program, Boulder, for respondent.

QUINN, Justice.

We granted certiorari to review a decision of the district court affirming a county court ruling suppressing visual observations and other evidence obtained by a police officer after stopping the defendant-motorist, Mark Gus Carlson, on suspicion of a traffic violation. The district court held that because the police officer did not have probable cause to arrest the defendant for driving under the influence of intoxicating liquor and because there was no evidence of a hazard to the officer's safety from either the defendant or passing traffic, the officer could not lawfully order the defendant to step out of his car and walk to the rear of the vehicle. Such order, in the district court's view, constituted an illegal seizure of the defendant's person, thereby rendering inadmissible any later-acquired

I.

The defendant was arrested on October 14, 1980, in Lafayette, Colorado, and was thereafter charged in the Boulder County Court with driving under the influence of intoxicating liquor. Section 42-4-1202(1)(a), C.R.S.1973. He filed a motion to suppress all evidence obtained from him, including visual observations, chemical testing, and a custodial statement to the police on the ground that such evidence was the fruit of an unconstitutional search and seizure in violation of the United States and Colorado Constitutions. *U.S. Const.* Amend. IV; *Colo. Const.* Art. II, Sec. 7. A hearing was held on the defendant's motion to suppress on January 30, 1981. The evidence, which consisted solely of the testimony of Lafayette Police Officer Gene Carlton, established the following facts.

At approximately 2:30 a.m. on October 14, 1980, Officer Carlton observed the defendant's Ford Pinto automobile traveling westbound on South Boulder Road in Lafayette. The stretch of road in question had no center line, and the defendant's vehicle was traveling midway in the road for approximately a quarter of a mile. The officer then watched the car move to the right side of the road and travel for approximately another quarter of a mile before again straying back to the center. When Officer Carlton activated his emergency lights, the defendant drove about 100 feet and eventu-

ally pulled over to the right side of the road.

The officer approached the defendant and asked him for his license. The defendant produced his license without any difficulty, at which point the officer noticed redness about his eyes and detected an odor of alcoholic beverage emanating from inside the car. Officer Carlton told the defendant to step out of the car and walk to the rear of the vehicle. When the defendant got out of his vehicle and walked to the rear, the officer observed that he was somewhat unsteady in his balance. At the rear of the vehicle Officer Carlton, after informing the defendant that he believed he was driving under the influence of alcohol, told him that he would like him "to do some roadside tests [but that] he didn't have to if he didn't want to." The defendant, according to the officer, agreed to submit to testing.

Before administering the tests the officer demonstrated each procedure to the defendant. The first test consisted of standing in an erect position, with the feet together and hands at the side, and then closing the eyes and tilting the head backward. The officer observed considerable swaying from side to side and from rear to front when the defendant attempted this maneuver. The defendant then performed the "finger to nose" test, in which he attempted to touch the tip of his nose with the first finger on each hand. The defendant, according to the officer, "completely missed on the left finger, touching his mouth." Last, the defendant was requested to walk "heel to toe" in the area between the rear of his vehicle and the front of the police vehicle, a distance of fifteen to twenty feet. After taking a few steps the defendant became unsteady and could no longer retain his balance. Officer Carlton then arrested the defendant for driving under the influence of intoxicating liquor. At the station house a chemical test on the

defendant's breath was administered, and the defendant, after being advised of his *Miranda* rights,[1] told the officer that he had consumed about five beers.

At the conclusion of the suppression testimony the county court ruled that the officer had a valid basis to initially stop the defendant for driving on the wrong side of the road and, as part of that stop, could properly order the defendant to get out of his car. The court, however, held that the officer's order to walk to the rear of the vehicle constituted an unlawful search unsupported by probable cause. Under derivative evidence principles the court therefore suppressed the officer's observations of the defendant made subsequent to the order, including the results of the roadside sobriety test, and also suppressed the results of the chemical test performed at the police station and the defendant's station house admission to the officer.

On appeal the district court noted that there are two situations in which an officer may request a driver to step out of his car during a valid traffic stop: (1) when the officer, having probable cause to believe the driver is under the influence of intoxicating liquor, intends to administer a roadside sobriety test; and (2) when there is a threat to the officer's safety posed either by a potential assault at the hands of the driver or by a traffic hazard. Since neither situation was present in this case, the district court concluded that the officer's ordering the defendant to step out and walk to the rear of the vehicle constituted an illegal arrest and, on that basis, affirmed the suppression ruling. We granted the People's petition for certiorari to consider whether the officer's observations of the defendant and other evidence obtained in the course of the defendant's detention and arrest were properly suppressed as a product of an unconstitutional search or seizure.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant had also been advised of his *Miranda* rights shortly after the initial stop, prior to the administration of the roadside tests by Officer Carlton. Neither

the county court held, nor does the defendant contend, that the statement to the officer at the station house violated the *Miranda* requirements.

## II.

A threshold issue we must determine is whether a police officer, in the course of a lawful traffic stop, may order the driver to get out of the vehicle and walk to the rear. The county court concluded that, although the officer legitimately ordered the defendant out of the car, his request that the defendant walk to the rear of the vehicle constituted an unlawful search. The district court, in contrast, determined that the officer's initial order to the defendant to step out of his vehicle was invalid because the officer at that point lacked probable cause to believe the defendant was intoxicated or posed a threat to the officer's safety. We conclude that the officer's order to get out of the vehicle and walk to the rear, issued after the defendant-motorist was lawfully stopped, did not constitute an unlawful search or seizure under the Fourth Amendment to the United States Constitution or Article II, Section 7 of the Colorado Constitution.

In *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam), the United States Supreme Court considered whether a police officer's order to a motorist to get out of the car, issued after the officer lawfully stopped the vehicle in order to issue the motorist a summons for driving with an expired license plate, constituted an unlawful seizure of the driver's person in violation of the Fourth Amendment. Recognizing "reason-

ableness" as the touchstone of Fourth Amendment analysis, the Court held that the order was clearly justified in the interest of the officer's safety and far outweighed the minimal inconvenience to the driver.[2] The hazards to a police officer investigating a traffic violation, the Court noted, include not only the risk of assault from the unknown driver, who might have access to weapons located inside the automobile, but also the danger of accidental injury from passing traffic during the officer's on-the-scene investigation. When weighed against the governmental interest in the officer's safety, the Court concluded that any additional intrusion occasioned by the order to get out of the vehicle "can only be described as *de minimis,*" especially since the driver has already been detained and he is being required "to expose to view very little more of his person than is already exposed." 434 U.S. at 111, 98 S.Ct. at 333, 54 L.Ed.2d at 337. The *Mimms* rationale, we believe, is equally applicable to an investigatory stop based on reasonable grounds to suspect a motorist of a traffic violation. The hazards to the officer's safety are no less during an investigatory stop of a motorist on reasonable suspicion of a traffic violation than when, as in *Mimms,* the stop is for the purpose of issuing a summons for a known traffic violation committed in the presence of the officer.[3]

2. In *Mimms,* the Court also upheld the frisk of the motorist because, after he got out of the vehicle pursuant to the officer's order, the officer observed a bulge in the motorist's jacket and reasonably believed that he might be armed and dangerous. 434 U.S. at 111–12, 98 S.Ct. at 334, 54 L.Ed.2d at 337–38. No frisk issue is raised in this case.

3. The district court acknowledged the Supreme Court's holding in *Mimms,* but believed that Colorado precedent, notably *People v. Davis,* 39 Colo.App. 63, 565 P.2d 1347 (1977), limited an officer's right to order a motorist out of the vehicle during an investigatory traffic stop not based on probable cause to those situations where the officer has reason to believe that the motorist would be a threat if allowed to remain in the car. We find *Davis* inapposite for two reasons. First, the facts underlying the initial confrontation in *Davis* did not involve a stop for

a suspected traffic offense or other law violation, but rather, a desire on the part of the officer to assist a motorist who appeared to be having car trouble. In rejecting the defendant's claim that his subsequent station house admission was the product of an illegal arrest, the court of appeals in *Davis* reasoned that, because the officer's initial contact with the defendant was motivated by an effort to offer assistance to a motorist who appeared to be disabled, the officer had the right to request production of the motorist's license and registration "in order to ascertain that the driver was licensed to drive and had authority to be in the possession of the car." 39 Colo.App. at 67, 565 P.2d at 1350. It does not follow from this holding, however, that when, as here, the officer has reasonable suspicion to stop a driver for a traffic violation, the officer's actions are limited to those permissible in a noncriminal encounter, such as the initial contact in *Davis.* Second, *Davis* was decided

■ Beginning with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), limited intrusions into one's personal security, short of the traditional arrest and full-scale search, have been approved in narrowly defined circumstances, even though probable cause to arrest or search is lacking. *See, e.g., Michigan v. Long,* —— U.S. ——, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (officer's reasonable suspicion that motorist stopped for speeding might be dangerous justifies limited search of passenger compartment of automobile for weapons during stop); *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (officers having search warrant for home may temporarily detain occupant of home, on less than probable cause, when occupant is leaving home immediately prior to commencement of search); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (officer may forcibly stop and frisk suspect on basis of informer's tip that suspect is armed and carrying narcotics). For a limited intrusion to be constitutionally permissible, the officer must have an articulable and specific basis in fact for suspecting that criminal activity has occurred or is about to take place, the purpose of the intrusion must be a reasonable one, and its scope and character must be reasonably related to its purpose. *See Michigan v. Long, supra; United States v. Place,* —— U.S. ——, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *People v. Lewis,* 659 P.2d 676 (Colo.1983); *People v. Johnson,* 199 Colo. 68, 605 P.2d 46 (1980); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971).[4]

In this case the constitutional requirements for a limited intrusion have been met. First, the officer's initial stop of the defendant was based on a reasonable suspicion of a traffic violation. The movement of the defendant's car from one side of the road to the other over a considerable distance justified the officer, as the county court found, in stopping the defendant to briefly investigate the circumstances of his driving behavior. Upon encountering the defendant in the driver's seat of his vehicle, the officer saw that his eyes were red and detected an odor of alcoholic beverage coming from inside the car. These additional observations, coupled with the somewhat erratic driving previously observed, furnished the officer with an articulable and specific basis in fact to suspect the defendant of driving under the influence of intoxicating liquor. Second, ordering a motorist to get out and walk to the rear of the vehicle or to a nearby place during a valid investigatory stop serves an eminently reasonable purpose—to reduce the risks to the officer's safety during the brief period of detention and investigation. Compliance with the order permits the officer to establish a face-to-face confrontation outside the vehicle, thereby reducing the possibility of unobserved action being taken against him and, at the same time, enables him to pursue his investigation a short distance from the vehicle, removed from the danger of passing traffic. Last, the scope and character of the intrusion are reasonably related to its purpose. The officer's order places no greater burden on the driver than to move a short distance where the possible hazards of the confrontation can be more effectively controlled during the period of valid detention. We therefore hold that an officer who reasonably suspects a motorist of violating the traffic laws may order the motorist to get out of the vehicle and walk to the rear or to some other nearby place, thereby ensuring the officer's safety while

before *Mimms,* which clearly recognizes the officer's right to require the motorist to get out of the vehicle after a valid traffic stop is made.

**4.** We note that section 42–4–1202.1, C.R.S.1973 (1983 Supp.), which became effective on July 1, 1982, and applies to offenses committed on or after that date, Colo.Sess.Laws 1982, ch. 166, Sec. 17 at 609, authorizes a law enforcement officer to stop any person whom he reasonably suspects of driving under the influence of, or

while his ability is impaired by, alcohol and to require the driver to give his name, address, and an explanation of his actions. The statute further provides that "[t]he stopping shall not constitute an arrest." Because, however, the statute was not in effect at the time of the events in this case, the question of its conformity to constitutional standards relating to limited intrusions is not before us and we express no opinion in that regard.

he investigates the suspected traffic violation.

### III.

Having resolved this preliminary issue, we turn to the suppression ruling itself. The county court held that the officer's order to walk to the rear of the vehicle constituted the inception of an illegal search. We disagree with this conclusion.

Merely because the officer was able to see the defendant as he walked to the rear did not render the officer's observation of the defendant the product of an unlawful search. A search consists of a looking for or seeking out that which is otherwise concealed from view. *People v. Sporleder*, 666 P.2d 135, 143–44 (Colo. 1983); 1 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.1 at 222 (1978). As noted previously, the officer's initial stop of the defendant was based on reasonable suspicion, and the officer's order to get out and walk to the rear was a legitimate intrusion calculated to ensure the officer's safety during the ensuing investigation. Any observation of the defendant's gait under these circumstances is no different than the viewing of his general physical characteristics, such as height, weight or build, all of which would be "in the plain view of an officer who has a right to be in the position to have that view." *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069 (1967) (per curiam); *see generally Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *People v. Gurule*, 196 Colo. 562, 593 P.2d 319 (1978).[5] In short, a driver of a motor vehicle has no legitimate expectation of privacy in his physical traits and demeanor that are in the plain sight of an officer during a valid traffic stop.

We are left then with the issue of the validity of the roadside sobriety tests, a matter not considered below. A roadside sobriety test involves an examination and evaluation of a person's ability to perform a series of coordinative physical maneuvers, not normally performed in public or knowingly exposed to public viewing, for the purpose of determining whether the person under observation is intoxicated.[6]

**5.** Although ordering a motorist to get out of a vehicle may not be used as a pretext for a search, there is nothing in Officer Carlton's testimony suggesting that his order was a pretext designed to elicit some evidence of the defendant's coordinative ability in the event the defendant's consent to roadside testing was not forthcoming. The officer testified that his usual practice was to tell the driver to step out of the vehicle if he intended to administer "further observations." In the context of the record the term "further observations" is an obvious reference to roadside sobriety tests later administered at the rear of the defendant's vehicle, and not to the defendant's act of walking to the rear of his car.

**6.** Wingleth & Stevens, *Evidentiary Aspects of Alcohol Ingestion*, in *Handling the D.U.I. Case* (1980) (published by Continuing Legal Education in Colorado, Inc. and the Colorado Bar Association Committee on Alcohol-Related Problems), recommend that the following four tests be given in sequence as part of roadside sobriety testing:

"1. The Rhomberg—state the following: 'Now, would you stand erect, with your hands down at your sides, your feet together, heels and toes touching. Close your eyes and tilt your head back. Do not open your eyes until I ask you to.' (Allow twenty seconds before asking him to open his eyes.) Persons under the influence will sway from side to side or front to rear. Persons not under the influence will move in a circular-type motion. End this and all other tests by saying, 'Thank you.'

"2. The Alphabet—state the following: 'Now, would you please recite the alphabet.' Sometimes, a person under the influence is not able to recite a correct alphabet and will skip or transpose letters. You can also ask the driver to count from one to ten and then count backward from ten to one with the same effect.

"3. Walking A Line—state the following: 'Now, I would like for you to look at this line on the pavement or sidewalk. (If there is no line, ask the subject to walk in a straight line towards you.) What I would like you to do is to walk along the center of this line touching your heel to your toe, keeping your toes pointing straight. Would you please start with your right foot, take five steps and turn around quickly to your left and walk back to where you are now.'

"4. Finger to Nose, Ear Lobe—state the following: 'Now, extend your arms away from the sides of your body to shoulder height,

Since these maneuvers are those which the ordinary person seeks to preserve as private, there is a constitutionally protected privacy interest in the coordinative characteristics sought by the testing process. Although some forms of governmental intrusion are so limited in scope as to be justified on a lesser quantum of evidence than probable cause, *see, e.g., Michigan v. Long, supra; Terry v. Ohio, supra,* a roadside sobriety test does not fall into this category.

■ Roadside sobriety testing constitutes a full "search" in the constitutional sense of that term and therefore must be supported by probable cause. The sole purpose of roadside sobriety testing is to acquire evidence of criminal conduct on the part of the suspect. Intrusions into privacy for the exclusive purpose of gathering evidence of criminal activity have traditionally required, at the outset of the intrusion, probable cause to believe that a crime has been committed. *See Michigan v. Clifford,* —— U.S. ——, 104 S.Ct. 641, 78 L.Ed.2d —— (1984); *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).[7] Moreover, the scope of the intrusion involved in the testing process cannot be characterized as anything less than substantial. When considered in terms of its intrusive potential, a roadside sobriety test is not far removed from chemical testing, pursuant to the implied consent law, of a

person's blood or breath for alcoholic content, section 42–4–1202(3)(a)(II), C.R.S.1973 (1983 Supp.), or of blood, saliva, or urine for drug content, section 42–4–1202(3)(a)(III), C.R.S.1973 (1983 Supp.). Before such chemical testing can be administered, the arresting officer must have reasonable grounds to believe that the person has been driving a motor vehicle under the influence of, or while the ability to operate the vehicle has been impaired by, alcohol or drugs. Section 42–4–1202(3)(b), C.R.S.1973 (1983 Supp.). Indeed, in some respects, roadside sobriety testing might be considered more invasive of privacy interests than chemical testing. The latter is usually performed in the relatively obscure setting of a station house or hospital, while roadside sobriety testing will often take place on or near a public street with the suspect exposed to the full view of motorists, pedestrians, or anyone else who happens to be in the area. Were this type of intrusive search to be permitted on less than probable cause, the "exception" created by *Terry* and its progeny would swallow the general rule that searches and seizures are reasonable only if based on probable cause. *See Dunaway v. New York,* 422 U.S. 200, 213, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824, 836 (1979); *People v. Sporleder, supra* at 143–44.

■ To satisfy constitutional guarantees against unlawful searches and seizures, therefore, a roadside sobriety test can be administered only when there is

keeping your elbows straight. Stand erect with your feet together. Extend the first finger on each hand. Now, with the very tip of your right finger, touch the very tip of your nose. Now, return that arm to the position it was in. Again, with your right finger, touch the very tip of your nose and return your arm straight. Now, with your left finger, I would like you to touch the very tip of your left ear lobe. Now you can let your arm down to your side.' " *Id.* at 7.

7. Crim.P. 41.1, for example, permits a court to issue an order requiring a person to be temporarily taken into custody for nontestimonial identification procedures, such as the taking of body fluids and samples, fingerprints, handwriting exemplars, voice samples, and appearing in a lineup. The order, however, must be sup-

ported by an affidavit showing that *there is probable cause to believe a crime has been committed,* and, in addition, a showing that there are reasonable grounds to suspect the person of having committed the offense and that the results of the specific nontestimonial identification procedures will be of material aid in determining whether the person committed the offense. *See People v. Madson,* 638 P.2d 18 (Colo. 1981). In the absence of consent, roadside sobriety testing incident to an investigatory stop not only lacks the safeguard of a neutral judicial scrutiny prior to the intrusion but, more to the point, would result in subjecting a person to an intrusive search for criminal evidence when there is not even a threshold showing of probable cause to believe any crime has been committed at all.

probable cause to arrest the driver for driving under the influence of, or while his ability is impaired by, intoxicating liquor or other chemical substance, or when the driver voluntarily consents to perform the test. The People do not contend, nor did the courts below find, that there was probable cause to arrest the defendant prior to the administration of the roadside testing. The only basis relied upon by the officer in administering the roadside tests was the defendant's alleged consent.

A voluntary consent to a search is a consent intelligently and freely given, without any duress, coercion or subtle promises or threats calculated to flaw the free and unconstrained nature of the decision. *E.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *People v. Helm,* 633 P.2d 1071 (Colo.1981). Voluntariness is a question of fact to be determined from the totality of circumstances; and while the suspect's knowledge of a right to refuse testing is a factor to be taken into account, such knowledge is not a prerequisite to establishing the voluntary character of a consent search. *Schneckloth v. Bustamonte, supra* at 248–49, 93 S.Ct. at 2059, 36 L.Ed.2d at 875; *People v. Elkhatib,* 632 P.2d 275 (Colo.1981); *People v. Hayhurst,* 194 Colo. 292, 571 P.2d 721 (1977). In a consent search, the prosecution bears the burden of proving voluntariness by clear and convincing evidence. *People v. Helm, supra; People v. Hancock,* 186 Colo. 30, 525 P.2d 435 (1974). Appropriate factors to consider include the age, education, and intelligence of the consenting person, the duration, location, and other circumstances of the search, the consenting person's state of mind, and any other factors that might have affected his free and unconstrained choice. *See People v. Helm, supra.*

Because the issue of consent is essentially a factual question, it would be inappropriate for us to resolve this issue in this proceeding. Rather, the appropriate procedure is to remand the case in order to allow the county court to resolve the consent issue in accordance with the above

principles. The county court must also determine, once the consent issue is resolved, whether Officer Carlton had probable cause to arrest the defendant for driving under the influence of intoxicating liquor.

The judgment is reversed and the cause is remanded to the district court with directions to return the case to the county court for further proceedings in accordance with the views expressed herein.

ROVIRA, J., concurs in part and dissents in part.

ERICKSON, C.J., joins in the concurrence and dissent.

NEIGHBORS, J., does not participate.

ROVIRA, Justice, concurring in part and dissenting in part:

I concur with that part of the court's opinion which holds that a police officer in the course of a valid traffic stop may order the driver to step out of the car and walk to the rear of the vehicle without violating the federal or state constitutional provisions relating to search and seizure. I believe that the court's decision to adopt the rationale of *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), thereby foregoing the opportunity of applying a different rule under the Colorado Constitution, is both wise and correct. *See People v. Sporleder,* 666 P.2d 135 (Colo.1983) (Erickson, C.J., and Rovira, J., dissenting).

I dissent from Part III of the majority opinion which holds that a roadside sobriety test constitutes a "search" in the constitutional sense of that term. The basis for the court's conclusion is that such a test involves an examination of a person's physical abilities, and the acts being observed are those acts which an ordinary person would consider to be private. From this, the majority opinion derives a constitutionally protected privacy interest in the "coordinative characteristics sought by the testing process." Maj. op. at 317. Having established a privacy interest, the court then compares roadside sobriety testing to

chemical testing and suggests that the former "might be considered more invasive of privacy interests" because it occurs "on or near a public street." *Id.* Consequently, the court concludes, before a roadside sobriety test can be administered, the officer must have probable cause to arrest for driving under the influence or while ability impaired, or the driver must voluntarily consent to such a test.

In *People v. Helm,* 633 P.2d 1071 (Colo. 1981), we considered the question of whether a person had to be informed that he had the right to refuse to take a roadside sobriety test before it was given. We held that "[k]nowledge of the right to refuse consent is not a prerequisite to a valid consent but one of many factors to be considered by the trial court." *Id.* at 1077. While this case focused primarily on the issue of consent, we did not hold that a roadside sobriety test can only be administered after there is probable cause to arrest for driving under the influence or while ability impaired.

In a special concurring opinion, I stated that in a stop for the investigation of "drunk driving," where the appearance, speech, and behavior of the driver provides the officer a *reasonable basis* to suspect that the driver has been driving while intoxicated, it is permissible for the officer to request the driver to take a roadside sobriety test without first obtaining his consent. I reasoned as follows:

> "This search—the display of physical characteristics—and this seizure—the observation and recording of the results of the test—involve none of the probing into an individual's private life and thoughts that marks an interrogation or a search for concealed evidence of criminal activity.... In light of such cases as *Schmerber v. California,* [384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)], and *Terry v. Ohio,* [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)], where the criminal suspect has no constitutional basis to invalidate or terminate the officer's Fourth Amendment intrusions, it seems reasonable to allow an officer to request a driver to perform a roadside sobriety test." *Helm,* 633 P.2d at 1080.

I believe that constitutional guarantees are well protected by requiring that the officer have a reasonable and articulable suspicion that the driver is under the influence or driving while ability impaired before requesting a person to perform a roadside sobriety test. *See Terry,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Sporleder,* 666 P.2d 135, 148 (Erickson, C.J., dissenting); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971). In *Stone,* we recognized that "[t]here is an area of proper police procedure in which an officer having less than probable cause to arrest nevertheless may detain an individual temporarily for certain purposes and not violate the unreasonable search and seizure limitation of the Fourth Amendment." *Id.* at 508, 485 P.2d at 497. If an officer has a reasonable suspicion that a person has committed or is about to commit a crime, if the purpose of the detention is reasonable, and if the character and scope of the detention are reasonable, the officer can detain and briefly question that person. *See People v. Lewis,* 659 P.2d 676 (Colo.1983); *People v. Tate,* 657 P.2d 955 (Colo.1983); *People v. Johnson,* 199 Colo. 68, 605 P.2d 46 (1980). I would apply *Stone* to situations involving roadside sobriety tests. These tests are not unreasonable intrusions upon the privacy of suspected drunk drivers, given the fact that the test takes only two or three minutes and that the officer's purpose is to prevent accidents by taking drunk drivers off the road. In a similar context, we held that the fifth amendment privilege against self-incrimination does not extend to the results obtained from a roadside sobriety test. *People v. Ramirez,* 199 Colo. 367, 609 P.2d 616 (1980). I would use the same approach in this case.

In my opinion, the majority's probable cause standard is unnecessarily stringent. It is also self-defeating. If a police officer feels that he has probable cause to arrest a person for driving under the influence or while ability impaired, he most likely will decide simply to arrest the offender. At this point, there would be no reason to

request a roadside sobriety test, except to gather additional evidence, and the officer may decide to bypass the test altogether. If, on the other hand, the officer feels that he does not have probable cause to arrest, he will either have to let the person go or elect to proceed under the "reasonable grounds" test set forth in the implied consent law, section 42–4–1202(3)(b), C.R.S. 1973 (1983 Supp.). In substance and effect, the majority has removed almost all practical significance from the administration of roadside sobriety tests. If these tests are to have any meaning at all, they should continue to serve as a means by which the officer can confirm the observations he has already made concerning the person's level of intoxication.[1] In this way, roadside tests serve an important function. They assist in the ultimate determination of whether probable cause to arrest exists. *See, e.g., Corr v. District Court,* 661 P.2d 668 (Colo.1983) (officer arrested driver after failing the roadside test); *Colgan v. State,* 623 P.2d 871 (Colo.1981) (same as *Corr* ); *Garcia v. District Court,* 197 Colo. 38, 589 P.2d 924 (1979) (same as *Corr* ). I conclude that a reasonable and articulable suspicion standard is appropriate. This lesser standard, rather than a strict probable cause standard, should govern the ability of a police officer to request a suspected drunk driver to take a roadside sobriety test.

I am authorized to say Chief Justice ERICKSON joins me in this concurrence and dissent.

---

**1.** In *People v. Ramirez, supra,* we stated that the purpose of the roadside sobriety test was to obtain tangible evidence of a person's physical condition, and the test was a significant improvement over the traditional stock description of slurred speech, bloodshot eyes, and odor of alcohol that often provided the basis for driving under the influence convictions prior to the institution of roadside sobriety tests.